UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROBERT KOSCIELSKI,

        Plaintiff,                                    Case No. 1:23-cv-10625

v.                                                Honorable Thomas L. Ludington
                                                      United States District Judge

DDP SPECIALTY ELECTRONIC
MATERIALS US, INC.,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT**

      For decades, Plaintiff Robert Koscielski worked for Defendant DDP Specialty Electronic Materials, U.S., Inc., and its predecessors as a Special Resins Operator. But in late 2020, Plaintiff started experiencing balance and coordination issues. After months off work in 2021 for doctors' visits and testing, Plaintiff was diagnosed with Central Pontine Myelinolysis (CPM).

      Despite his CPM, Plaintiff returned to work with medical restrictions in 2021. But these restrictions prevented him from completing his duties as a Special Resins Operator. So in 2022—after Defendant confirmed that Plaintiff's restrictions were permanent—Defendant terminated Plaintiff's employment. And Defendant later declined to hire Plaintiff for two positions with similar duties to which Plaintiff applied.

      Plaintiff then sued Defendant on February 2, 2023, alleging failure-to-accommodate and disability discrimination claims under Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), MICH. COMP. LAWS § 37.1101 *et seq.* Defendant then sought summary judgment, arguing that Plaintiff's CPM falls outside the PWDCRA's protections. As explained below,

Defendant is correct. So Defendant's Motion for Summary Judgment will be granted, and Plaintiff's Complaint will be dismissed.

## I.

### A.

In 1998, Dow Chemical Company hired Plaintiff Robert Koscielski as an entry-level skills employee. ECF No. 23-14 at PageID.603. In this role—referred to as a packager—Plaintiff was responsible for packaging liquid and powder insecticide. ECF No. 23-14 at PageID.604. During his tenure, Dow merged with DuPont to form DowDuPont, which later split, creating Defendant DDP Specialty Electronic Materials, U.S., Inc., as a subsidiary of DuPont. *Id.* at PageID.599, 603–04; *see also* ECF No. 20 at PageID.98, n.1. Plaintiff spent a year and a half as a packager, ascending the seniority list for skills employees. ECF No. 23-14 at PageID.604–05.

Plaintiff's seniority earned him a job as an Anion Operator in 2000. *Id.* at PageID.605. In this position, each shift, Plaintiff worked with three other Anion Operators on a chemical production process involving copolymers, which are plastic-like beads that turn into resin beads used to filter various liquids' impurities. *Id.* at PageID.607–08; *see also* ECF No. 24-2 at PageID.829. Plaintiff split his time monitoring this process in a control room and performing tasks like equipment maintenance and loading copolymer into tanks in the production field. ECF No. 23-14 at PageID.608.

In 2008, Plaintiff moved to a "more serious" position: Special Resins Operator. *Id.* at PageID.606, 609. Plaintiff's role as a Special Resins Operator involved a production process like the anion process—it required operators to monitor the production process in the control room part of the time and work in the field executing production tasks the rest of the shift. *See id.* at PageID.605–06, 614; *see also* ECF No. 24-2 at PageID.829. But the special resins process was

smaller scale and used fine-mesh copolymers. ECF No. 23-14 at PageID.613–14. And the role was more independent because Defendant staffed only one Special Resins Operator per shift. *Id.* at PageID.606, 609, 611–12, 615.

This independence mattered because a Special Resins Operator's fieldwork featured physical duties. Indeed, according to the job description, Plaintiff, other operators, and other employees familiar with the job, Special Resins Operators' duties included the following tasks:

> 1. Climbing ladders and stairs to access production equipment, including pipes and pressure release devices (PRDs), to perform maintenance, "lockout" and "tagout" equipment undergoing maintenance, and accomplish other routine tasks "up to 50%" of a shift. *See* ECF Nos. 20-4 at PageID.262; 23-14 at PageID.635–39; 23-2 at PageID.479; 23-19 at PageID.803; 23-18 at PageID.791–92; 24-2 at PageID.830; 23-16 at PageID.760–64.
>
> 2. Operating fork trucks to move pallets of copolymer and other chemicals and perform various production tasks. *See* ECF Nos. 20-4 at PageID.262; 23-14 at PageID.626–27, 632, 641; 23-2 at PageID.501; 23-18 at PageID.792; 23-19 at PageID.803; 24-2 at PageID.829.
>
> 3. Wearing a self-contained breathing apparatus (SCBA)—a respirator mask attached to a backpack with an air tank—to take samples and respond to emergencies. *See* ECF Nos. 20-4 at PageID.262; 23-14 at PageID.613, 626; 23-2 at PageID.479, 482, 503; 23-16 at PageID.752, 760; 24-2 at PageID.830–31; 23-19 at PageID.803; 23-18 at PageID.792.
>
> 4. Bending and squatting to complete production tasks, including locking- and tagging-out equipment undergoing maintenance. *See* ECF Nos. 20-4 at PageID.262; 23-14 at PageID.631; 24-2 at PageID.830; 23-16 at PageID.763; 23-19 at PageID.803.
>
> 5. Working a swing-shift rotation, alternating with the other two special resins operators between day, evening, and night shifts. *See* ECF No. 20-4 at PageID.262; 23-2 at PageID.489; 23-19 at PageID.803; 23-16 at PageID.775; 24-2 at PageID.828–29.

Defendant deemed these duties essential for Special Resins Operators. *See* ECF No. 23-13 at PageID.587. And until 2020, Defendant performed these duties without incident. *See* ECF No. 20-2 at PageID.178–79.

But things changed in late 2020. Plaintiff noticed issues with his balance and coordination, and he had irregular electrocardiogram (EKG) results. *Id.*; ECF No. 23-3 at PageID.542. When these issues persisted, Plaintiff notified Defendant's health services on February 16, 2021. ECF No. 23-3 at PageID.542. Two days later, Defendant underwent a stent operation for his irregular EKG. *Id.*; *see also* ECF No. 20-2 at PageID.178.

Defendant quickly recovered from the operation and returned to work without restrictions on February 22, 2021. ECF Nos. 23-4 at PageID.544; 23-5 at PageID.547. But the operation did not remedy Plaintiff's balance problems, and he almost fell over at work. *See* ECF No. 23-6 at PageID.548. So on March 4, 2021, Plaintiff notified Defendant's health team about his continued symptoms, which advised him to visit his primary care physician for further assessment. *See id.*; ECF No. 20-2 at PageID.181–82.

Plaintiff heeded that advice, and it launched a months-long endeavor to identify what caused Plaintiff's symptoms. On March 9, 2021, Plaintiff's primary care physician removed him from work. ECF Nos. 23-7 at PageID.550; 23-9 at PageID.553. From March 2021 to August 2021, Defendant received short-term disability leave from Defendant while Plaintiff visited several doctors for magnetic resonance imaging (MRI) scans and other testing. *See* ECF Nos. 23-9 at PageID.555–77; ECF No. 23-10; 20-2 at PageID.181–83; 23-8 at PageID.551–52. During this period, Plaintiff kept Defendant's health team apprised. *See* ECF No. 23-9. In July 2021, when Plaintiff revealed that he may be able to return to work in August with restrictions, Defendant's health team noted concerns that such restrictions "may be permanent." ECF No. 23-10 at PageID.580. But the health team stated it "would go down the accommodation process if that is the case." *Id.*

Without a conclusive diagnosis, Plaintiff's neurologist—Dr. Jeanie Cote—authorized Plaintiff to return to work in early August 2021. ECF Nos. 23-12 at PageID.584; 23-11 at PageID.582. But as expected, this authorization came with restrictions. *See* ECF Nos. 23-12 at PageID.584; 23-11 at PageID.582. To that end, Dr. Cote restricted Plaintiff from (1) working alone in the field, (2) lifting over ten pounds, and (3) working the evening and night shifts. *See* ECF Nos. 23-12 at PageID.584; 23-11 at PageID.582. Yet Dr. Cote could not entirely explain Plaintiff's restrictions without knowing Plaintiff's full range of duties. *See* ECF No. 20-2 at PageID.191. And Plaintiff did not know that Dr. Cote sent these restrictions to Defendant or what they encompassed. *Id.* at PageID.184–85.

Soon after, Plaintiff received a conclusive diagnosis: Central Pontine Myelinolysis (CPM). ECF Nos. 20-2 at PageID.131, 183. This diagnosis explained Plaintiff's symptoms. Indeed, CPM "is a condition affecting myelin and nerve cells in the middle part of your brainstem called the pons" that can cause balance and coordination problems, as Plaintiff experienced. *See Central Pontine Myelinolysis (CPM): Causes & Treatment*, CLEVELAND CLINIC (2024), https://my.clevelandclinic.org/health/diseases/22445-central-pontine-myelinolysis-osmotic-demyelination-syndrome [https://perma.cc/LH8Y-XR7F].

**B.**

When Dr. Cote cleared Plaintiff to return to work, Defendant obliged his restrictions. Defendant limited Plaintiff to day shifts, while Raini Lucas—an alternate who had fulfilled Plaintiff's duties when he was on leave—took Plaintiff's spot in the swing rotation. *See* ECF Nos. 20-2 at PageID.185; 23-16 at PageID.774–75; 23-19 at PageID.803; 20-9 at PageID.308. Even so, Plaintiff completed several Special Resins Operator tasks, including washing equipment, conducting maintenance, and creating procedures for training and learning guides. *See* ECF No.

20-2 at PageID.186, 192. But Plaintiff did not climb ladders, replace PRDs, drive forklifts, wear SCBA, or work the swing shift. *Id.* at PageID.192–93; ECF No. 23-2 at PageID.479. In other words, under his restrictions, Plaintiff could not complete all the Special Resins Operator duties. *See* ECF Nos. 23-2 at PageID.498, 504; 20-2 at PageID.186.

This arrangement proceeded without issue until March 2022. Then, Plaintiff's new supervisor—Justin Huschke—did not understand the scope or duration of Plaintiff's restrictions. *See* ECF Nos. 23-16 at PageID.772–73; 23-17 at PageID.781–84. So on March 18, 2022, Huschke emailed Defendant's health team requesting more information about the restrictions when it alerted him that Plaintiff's restrictions were extended to May 13, 2022:

> As [Plaintiff's] immediate supervisor, I am requesting information regarding [Plaintiff's] current restrictions. There has been some concerns with regards to some of the tasks that he has been performing in the plant. As I was not here when the restrictions were first put in place, I am not fully aware of what they are specifically. Could you please provide me his restrictions? Additionally, I would like to further understand the 5/13/2022 end date of the restrictions. Also, Bob did share with me his diagnosis and a bit of how there is no expected treatment to fully reverse the effects.

ECF No. 23-17 at PageID.784. The health team shared Plaintiff's restrictions with Huschke, but because Dr. Cote was off work for personal reasons, the team notified Huschke that it could not get further clarification until Plaintiff's next scheduled appointment on May 13, 2022. *See id.* at PageID.782–83.

May 13, 2022, passed without an update because Plaintiff's appointment was moved to August 2022. *Id.* at PageID.781. As a result, Defendant's health team sent a letter to Dr. Cote seeking clarification. *See id.* Moreover, Defendant's management determined that "it looks like the restrictions are intended to be permanent, as it'll be about a year since they started before his next appointment." *Id.* Management also decided that it needed "to hold a reasonable accommodation interview with [Plaintiff] once [it had] the letter back." *Id.*

On June 20, 2022, Dr. Cote responded to the letter with more information. *See* ECF No. 20-10. In the response, Dr. Cote stated that Plaintiff could not (1) work a swing shift, (2) climb stairs or ladders, (3) lift over fifty pounds, (4) bend or squat, (5) drive a fork truck, (6) use hand tools, or (7) wear a full respirator. *Id.* at PageID.320–21. Dr. Cote also confirmed that these restrictions were permanent. *Id.* at PageID.321.

After discussing the scope of the restrictions with Plaintiff in July 2022, Defendant scheduled an accommodation review. *See* ECF Nos. 23-17 at PageID.778; 20-11 at PageID.323; 20-12 at PageID.328. On September 28, 2022, Defendant conducted an interactive accommodation review with Plaintiff. *See* ECF Nos. 23-13; 20-2 at PageID.199–201. An interactive accommodation review (IAR) is a meeting where the employer and employee review the employee's restrictions, compare them to his essential duties, and determine whether reasonable accommodations are available. *See* ECF Nos. 23-13 at PageID.585–90; 20-12 at PageID.331–32. During Plaintiff's IAR, Defendant concluded that Plaintiff's restrictions prevented him from completing essential duties—and no reasonable accommodation would allow him to complete them. *See* ECF Nos. 23-13 at PageID.588–89. And because Defendant determined that there were no open positions that could "meet his restrictions," it decided to terminate Plaintiff's employment, and the Parties initially agreed that Plaintiff would apply for long-term disability. *Id.* at PageID.589–91.

The following week, Plaintiff contacted Defendant's Human Resources (HR) for guidance on his long-term disability paperwork. *See* ECF No. 23-20 at PageID.812. After HR responded and asked if he had signed the IAR agreement, Plaintiff declared that he would not sign it because he did not think long-term disability was "the only option." *Id.* at PageID.810. To that end, Plaintiff emphasized that he could do several non-physical components of his job. *Id.* But HR reiterated

that "taking into account your permanent restrictions from your doctor . . . it was identified [Defendant] would not be able to accommodate you in your current role. In addition, there are no open roles in Michigan [that] meet your restrictions and qualifications." *Id.* And HR finished its communication with Plaintiff by informing him that October 31, 2022, would be his last day of reporting to work. *Id.* Yet Defendant would delay terminating Plaintiff's employment until he completed his long-term disability application. *Id.*

In November 2022, Plaintiff submitted updated restrictions from Dr. Cote that permitted him to climb stairs, use hand tools, and wear an ordinary respirator. ECF No. 20-14. Otherwise, the restrictions remained unchanged: Plaintiff still could not (1) work a swing shift, (2) climb ladders, (3) lift over fifty pounds, (4) bend or squat, (5) drive a fork truck, or (6) wear an SCBA. *Compare id.* at PageID.346 *with* ECF No. 20-10 at PageID.320–21. So on December 15, 2022— once Plaintiff's long-term disability application was pending—Defendant terminated Plaintiff's employment because its available positions could not accommodate Plaintiff's restrictions. ECF Nos. 23-20 at PageID.809; 20-2 at PageID.136.

## C.

Attempting to continue to work for Defendant, Plaintiff applied for three other positions. *See* ECF No. 20-2 at PageID.213–14. First, Plaintiff applied for an Anion Technical Advisor position. *See* ECF Nos. 20-22; 20-2 at PageID.213. Second, he applied for a Cation Technical Advisor job. *See* ECF Nos. 20-20; 20-2 at PageID.214. Third, he applied for a Plant Engineer role. ECF Nos. 20-21; 20-2 at PageID.213.

The two Technical Advisor jobs were similar. *Compare* ECF Nos. 20-20 at PageID.384–86 *with* 20-22 at PageID.405–07. Plaintiff received an interview for the Anion Technical Advisor role shortly after he sent his updated restrictions to Defendant. *See* ECF No. 20-2 at PageID.209.

But Defendant did not select Plaintiff for either Technical Advisor role. *See* ECF Nos. 20-2 at PageID.209, 214; 20-20 at PageID.377; 20-22 at PageID.401. Both jobs featured many of the physical requirements Plaintiff's medical restrictions barred: (1) climbing ladders, (2) driving fork trucks, (3) wearing SCBA, and (4) bending and squatting. *See* ECF Nos. 20-22 at PageID.406–07; 20-20 at PageID.385–86; 20-18 at PageID.366. And Technical Advisors and production leaders confirmed that those duties were a part of the job. *See* ECF Nos. 20-18 at PageID.363–64; 20-9 at PageID.309–10; 20-6 at PageID.274–75.

Nor did Defendant hire Plaintiff as a Plant Engineer. *See* ECF No. 20-21 at PageID.390. The position required an engineering degree. *Id.* at PageID.396; ECF No. 20-2 at PageID.214. But Plaintiff did not have one. *See* ECF No. 20-2 at PageID.214.

After that, Plaintiff did not apply for any other positions. *Id.* at PageID.136. Plaintiff refrained from doing so because he was approved for long-term disability and Social Security disability benefits in 2023—which were back-dated. *See id.* at PageID.136–38. And according to Plaintiff, these benefits paid enough to where "[t]here was not a job out there where" Plaintiff would not take "a big pay cut." *Id.* at PageID.136.

### D.

On February 2, 2023, Plaintiff sued Defendant in the 42nd Circuit Court in Midland County, Michigan. ECF No. 1-2 at PageID.9. But Defendant removed the suit to this Court. ECF No. 1. Plaintiff asserts two claims under Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), MICH. COMP. LAWS § 37.1101 *et seq.*—one alleging Defendant failed to reasonably accommodate him, and the other alleging Defendant engaged in unlawful discrimination. *See id.* at PageID.17–22. In essence, Plaintiff alleges that Defendant violated the PWDCRA when it (1) did not accommodate Plaintiff's CPM, and (2) fired Plaintiff and did not select him for the

positions he applied for because of his CPM. *Id.* Defendant sought summary judgment. ECF No. 20.

## II.

Summary judgment is proper when no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if, based on the evidence presented, a reasonable jury could return a verdict for the nonmoving party. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018). When seeking summary judgment, the movant must identify parts of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the nonmovant to "present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (cleaned up). Courts cannot consider a nonmovant's inadmissible hearsay evidence. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). And the mere existence of a scintilla of evidence supporting the nonmovant's position will not suffice to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

At this stage, courts cannot weigh the evidence presented. *Id.* at 249. Nor can courts assess the competency and credibility of witnesses. *Id.* at 255. And courts must draw all reasonable inferences for the nonmovant. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024).

### III.

### A.

Before addressing the merits, some background on the PWDCRA is helpful. Enacted in 1976, the PWDCRA aims to combat disability discrimination, including in employment settings.[1] MICH. COMP. LAWS §§ 37.1101 *et seq*; *Chmielewski v. Xermac, Inc.*, 580 N.W.2d 817, 821 (Mich. 1998). To that end, the PWDCRA principally contemplates two types of violations of its commands: (1) engaging in discriminatory conduct as outlined in the act; and (2) failing to provide a reasonable accommodation to a person with a qualifying disability.[2] *See* MICH. COMP. LAWS § 37.1102. But like any enacted law, the PWDCRA does not pursue its aims without limitation. *See Peden v. City of Detroit*, 680 N.W.2d 857, 871–73 (Mich. 2004); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012).

Indeed, the PWDCRA limits who it protects by narrowly defining "disability." *See* MICH. COMP. LAWS §§ 37.1103(d). For employment, a disability is a "determinable physical or mental characteristic" that "substantially limits" one or more major life activities *and* is "unrelated to" either the employee's "ability to perform the duties of" his job, or the employee's "qualifications for employment or promotion." *Id.* § 37.1103(d)(*i*)(A) (emphasis added). And "unrelated to" the employee's ability to perform his duties means "with or without accommodation, an [employee]'s disability does not prevent the individual from . . . performing the duties of a particular job or position." *Id. §* 37.1103(*l*)(*i*). So the upshot of the PWDCRA's layered definition of disability is

---

[1] The PWDCRA was initially titled the Handicappers' Civil Rights Act. *Pernak v. Ashland, Inc.*, 330 F. Supp. 2d 890, 896 (E.D. Mich. 2004). But Michigan renamed it the PWDCRA in 1998, so this Court will refer to it that way. *Michalski v. Reuven Bar Levav*, 625 N.W.2d 754, 756 n.1 (Mich. 2001).
[2] Though ancillary, the PWDCRA also prohibits retaliation, aiding and abetting violations of the act, and obstructing compliance with and enforcement of the act. *See* MICH COMP. LAWS § 37.1602.

this: An employee can suffer from a debilitating ailment but not fall within the PWDCRA's protections if that ailment is related to his qualifications or ability to perform his duties. *See, e.g.*, *Peden*, 680 N.W.2d at 871–73; *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 406 (Mich. Ct. App. 1999).

To see this definition applied, consider the following cases where a court held that an employee's ailment was related to his duties and thus outside the scope of the PWDCRA's protection. Start with *Peden v. City of Detroit*, 680 N.W.2d 857 (Mich. 2004). There, the plaintiff was a police officer who suffered a heart attack. *Id.* at 860. After his heart attack, the plaintiff's physician released him to return to work with indefinite restricted duty. *Id.* He remained a police officer for ten years as a clerk and eventually moved to a crime analysis unit. *Id.* After these ten years, the department placed him on involuntary disability retirement because he could not fulfill several requirements in a recently compiled list of duties that the department deemed essential for all police officers. *Id.* The Michigan Supreme Court held that the plaintiff's disability was related to his duties as a police officer. *Id.* at 872–73. The court reasoned that because the plaintiff could not fulfill "the full range of" the duties on the police department's essential duties list—even with an accommodation—the plaintiff failed to establish that it was within the meaning of "disability" under the PWDCRA. *Id.* at 873.

Next consider *Kerns v. Dura Mech. Components, Inc.*, 618 N.W.2d 56 (Mich. Ct. App. 2000). In *Kerns*, the plaintiff suffered from several ailments—including arthritis, carpal tunnel, cervical radiculopathy, and bilateral ankylosis—that restricted his ability to walk and stand for prolonged periods. *Id.* at 63. As a result, the plaintiff could not perform all his duties as an industrial relations manager. *Id.* And the only way the plaintiff could continue working in that job was if the employer modified or eliminated some of his essential job duties. *See id.* at 64. But because

employers have no duty under the PWDCRA "to accommodate the plaintiff by recreating [a] position, adjusting or modifying job duties otherwise required by the job description, or placing the plaintiff in another position," the Michigan Court of Appeals held that the plaintiff's ailments related to his ability to perform his job and fell outside the PWDCRA's definition of disability. *Id.*

And now consider *Szasz v. Dolgencorp, LLC*, 625 F. App'x 297 (6th Cir. 2015). The plaintiff in *Szasz* was a full-time assistant manager at a retail store. *Id.* at 299. Part of the plaintiff's job was physical: she had to restock shelves, which—as her job description noted—often required her to lift up to forty pounds and sometimes up to fifty-five. *Id.* at 301. The plaintiff sustained injuries in a car accident, and her doctor imposed medical restrictions that prevented her from working more than four hours at once and lifting over ten pounds. *Id.* at 300. The Sixth Circuit held that because these medical restrictions prevented the plaintiff from completing essential duties listed in her job description—working full-time and lifting over fifty pounds—her injuries were related to her duties as an associate manager. *See id.* at 302–03. So the plaintiff's injuries did not meet the PWDCRA's definition of disability. *Id.*; *accord Picard v. Costco Wholesale Corp.*, No. 220CV10005TGBAPP, 2022 WL 4122081, at *5–7 (E.D. Mich. Sept. 9, 2022) (finding that a store clerk's ailments and corresponding medical restrictions, which prevented her from lifting over twenty pounds and limited her ability to sit, stand, and walk at will, were related to her duties when her essential duties required her to occasionally bend, squat, climb, reach, and lift over twenty pounds).

Against that backdrop, this definition of disability logically shapes the elements of disability discrimination and failure-to-accommodate claims under the PWDCRA—presenting a threshold issue for both. For disability discrimination claims, a plaintiff must prove: (1) he suffers from a qualifying ailment; (2) his ailment is unrelated to his job duties or qualifications; and (3)

his employer engaged in discriminatory conduct delineated in the act. *Peden*, 680 N.W.2d at 863. Compare those with the elements for failure-to-accommodate claims, which require a plaintiff to show: (1) he suffers from a qualifying ailment; (2) his ailment is unrelated to his job duties or qualifications; (3) his employer knew or should have known of his disability; (4) he requested an accommodation; and (5) his employer failed to provide a reasonable accommodation. *Greiner v. Macomb Cnty.*, No. 17-2417, 2019 WL 8884615, at *4 (6th Cir. Aug. 16, 2019). Put simply, the first two elements for both claims require the plaintiff to show that his ailment aligns with the PWDCRA's definition of disability. So if the plaintiff brings both a disability discrimination and failure-to-accommodate claim, and his ailment does not satisfy the PWDCRA's definition of disability, both claims lack merit. *See, e.g.*, *id.*

**B.**

Back to this case. Defendant argues that it is entitled to summary judgment on both Plaintiff's claims because Plaintiff cannot establish that his CPM falls within the definition of "disability" under the PWDCRA. *See* ECF No. 20 at PageID.110–17. Defendant does not dispute the first part of the definition and the first element of Plaintiff's claims—that Plaintiff's CPM is a determinable physical characteristic that "substantially limits" a major life activity. *See generally id.* Rather, Defendant focuses on the second part of the definition and the second element of Plaintiff's claims and contends that Plaintiff's CPM was related to his job duties and qualifications. *See id.* To that end, Defendant contends that Plaintiff's CPM was related to (1) his duties as a Special Resins Operator, and (2) his qualifications for the Technical Advisor positions to which he later applied. *See id.* Defendant is correct.

**1.**

Start with Plaintiff's Special Resins Operator job. The Michigan Supreme Court employs a two-fold analysis to discern whether a plaintiff's ailment is related to his job duties or qualifications for a job: (1) What are the essential duties of the relevant job? (2) Could the plaintiff, with or without accommodation, fulfill those duties given his ailment? *See Peden*, 680 N.W.2d at 871–73. Here, Plaintiff's CPM prevented him from fulfilling the essential duties of a Special Resins Operator—with or without accommodation—so his CPM was related to his duties. Thus, Plaintiff's CPM falls outside the PWDCRA's protections.

***Essential Duties of a Special Resins Operator.*** In determining what duties are essential for a particular job, the employer's "judgment about the duties of a job" is not always dispositive. *Id.* at 871. But the employer's judgment is "always entitled to substantial deference." *Id.* at 871. And unless the plaintiff presents "sufficient evidence to overcome this deference," the employer's judgment controls. *Id.*

Here, Defendant enumerates several physical responsibilities, like climbing ladders, operating fork trucks, bending and squatting to complete tasks, wearing an SCBA, and working a swing shift, among the essential duties of a Special Resins Operator. *See* ECF No. 23-13 at PageID.587. This judgment controls.

Indeed, numerous portions of the record reinforce Defendant's judgment—which is already afforded substantial deference—making clear that those enumerated physical responsibilities were essential duties of a Special Resins Operator. First, the Special Resins Operator job description lists those duties. *See* ECF No. 20-4 at PageID.262. Second, Plaintiff testified that he conducted those duties as a Special Resins Operator before his CPM. *See* ECF Nos. 23-2 at PageID.479, 482, 489 501, 503; 23-14 at PageID.613, 626–29, 631–32, 635–39, 641.

Third, other operators stated that those duties were a part of the job. *See* ECF No. 23-19 at PageID.803. Fourth, production management and those familiar with the job testified that Special Resins Operators must fulfill those duties. *See* ECF Nos. 23-16 at PageID.752, 760–64, 775; 23-18 at PageID.791–92; 24-2 at PageID.828–31. And nothing in the record contradicts that these physical duties were components of a Special Resins Operator's job.

Plaintiff's argument to the contrary is misplaced. Plaintiff argues that the fact that Defendant retained him from August 2021 to October 2022 without him completing those physical duties implies that they were not essential. *See* ECF No. 23 at PageID.460–63. But temporarily retaining an employee who is restricted from performing all the duties of his job does not, by itself, mean that the duties he could not perform were minor or unessential. *See, e.g.*, *Peden*, 680 N.W.2d at 871–73 (retaining an employee who could not perform all essential duties for ten years before terminating his employment). And in any event, the record reveals that Defendant's initial uncertainty about the scope of Plaintiff's medical restrictions and whether they were permanent—along with Defendant waiting to terminate Plaintiff's employment until he completed his long-term disability application—drove his temporary retention. *See* ECF Nos. 23-16 at PageID.772–73; 23-17 at PageID.781–84; 23-20 at PageID.810.

At bottom, Plaintiff has not presented sufficient evidence to overcome the substantial deference afforded to Defendant about the essential duties of a Special Resins Operator. So climbing ladders, operating fork trucks, bending and squatting to complete tasks, wearing an SCBA, and working a swing shift were among the essential duties of a Special Resins Operator.

***Whether Plaintiff Could Fulfill These Duties.*** With or without accommodation, Plaintiff's CPM prevented him from fulfilling these essential duties. It is undisputed that Plaintiff's medical restrictions—even when updated in November 2022—barred him from completing the following

essential duties: (1) working a swing shift, (2) climbing ladders, (3) bending and squatting, (4) operating a fork truck, or (5) wearing an SCBA. ECF No. 20-14 at PageID.346. Indeed, Plaintiff testified that he did not complete those duties once he had CPM. *See* ECF Nos. 20-2 at PageID.186, 192–93; 23-2 at PageID.479, 498, 504. And Plaintiff does not present a single accommodation that would allow him to fulfill the full range of his essential duties without "recreating his position" or "adjusting or modifying job duties otherwise required by the job description," which are not reasonable accommodations under the PWDCRA. *See Kerns*, 618 N.W.2d at 64. Thus, Plaintiff's CPM was related to his duties as a Special Resins Operator, meaning it falls outside the PWDCRA's definition of disability. *See id.*; *see also Peden*, 680 N.W.2d at 871–73; *Szasz*, 625 F. App'x at 302–03; *Picard*, 2022 WL 4122081, at *5–7.

In sum, Plaintiff's CPM was related to his duties as a Special Resins Operator. Indeed, climbing ladders, operating fork trucks, bending and squatting to complete tasks, wearing an SCBA, and working a swing shift were among the essential duties of a Special Resins Operator. And Plaintiff's CPM prevented him from fulfilling those duties. So Plaintiff's CPM falls outside the PWDCRA's definition of disability, and he cannot establish the second element of his failure-to-accommodate or disability discrimination claims for Defendant terminating his employment as a Special Resins Operator.

**2.**

Plaintiff's CPM was also related to his qualifications for Technical Advisor positions, the positions to which he later applied but for which Defendant did not select him.[3] As Technical

---

[3] In his brief, Plaintiff does not argue that Defendant violated the PWDCRA when it did not hire Plaintiff for the Plant Engineer job. *See generally* ECF No. 23. Nor could he. The Plaint Engineer job required an engineering degree, *see* ECF No. 20-21 at PageID.396, which Plaintiff did not have, *see* ECF No. 20-2 at PageID.214.

- 17 -

Advisor job descriptions and testimony from Technical Advisors and production leaders show, climbing ladders, driving fork trucks, wearing SCBA, and bending and squatting were among the essential duties of Technical Advisors. *See* ECF Nos. 20-22 at PageID.406–07; 20-20 at PageID.385–86; 20-18 at PageID.363–64; 20-9 at PageID.309–10; 20-6 at PageID.274–75. As explained above, Plaintiff's medical restrictions for his CPM prevented him from accomplishing those tasks—with or without accommodation. So Plaintiff's CPM also falls outside the PWDCRA's definition of disability for Technical Advisor jobs, and he cannot establish the second element of his failure-to-accommodate or disability discrimination claims for Defendant declining to select him for them.

In the end, Plaintiff's CPM was related to both his ability to perform the duties of a Special Resins Operator and his qualifications for the Technical Advisor roles for which he applied. Thus, Plaintiff cannot establish his failure-to-accommodate or disability discrimination claims under the PWDCRA. So Defendant's Motion for Summary Judgment, ECF No. 20, will be granted, and Plaintiff's Complaint, ECF No. 1-2, will be dismissed.

## IV.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 20, is **GRANTED**.

Further, it is **ORDERED** that Plaintiff's Complaint, ECF No. 1-2, is **DISMISSED**.

**This is a final order and closes the above-captioned case**.

Dated: March 28, 2025                           s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge